IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

LONNIE HODGE, JR.                                                                                PLAINTIFF

V.                                           NO. 1:08cv00014 JWC

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lonnie Hodge, Jr., seeks judicial review of the denial of his claim for a period of disability and disability insurance benefits and supplemental security income (SSI) benefits. Both parties have submitted briefs (doc. 11, 15).

For the reasons that follow, the Court[1] **reverses** the Commissioner's decision and **remands** the case for further administrative proceedings.

I.

The Commissioner's denial of benefits must be upheld upon judicial review if the decision is supported by substantial evidence in the record as a whole. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Wiese*, 552 F.3d at 730.

---

[1]The parties have consented to the jurisdiction of the United States Magistrate Judge (doc. 5).

II.

In his application documents and at the hearing before the ALJ, Plaintiff alleged inability to work since March 27, 2002, due to chronic right shoulder pain, osteoarthritis, "nerve damage," and pain in his back, arm, and hand.  (Tr. 66, 93-94, 117, 489, 529.)  He was thirty-six years old at the time of the hearing and has a high school education.  (Tr. 522.)  He has past work as a pizza delivery person, janitor, and factory laborer (Tr. 94-95, 107-11, 523-24.)

Under the applicable law, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The regulations provide a five-step sequential process to determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Basically, those procedures require the ALJ to take into account whether a claimant is working, whether the claimant's physical or mental impairments are severe, whether the impairments meet or equal an impairment listed in the regulations, whether the impairments prevent a resumption of work done in the past, and whether they preclude any other type of work.  *Id.*

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  The ALJ next determined, at step two, that Plaintiff suffered from severe impairments of osteoarthritis, chronic right shoulder pain and carpal tunnel syndrome, but that none of his impairments, singly or in combination, equaled a step-three listed impairment as contained in the regulations.  The ALJ next determined that

Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at the medium level, which did not preclude his past work as a pizza delivery person and janitorial laborer. In making this determination, the ALJ relied on the testimony of a vocational expert. The ALJ thus found that Plaintiff could perform his past relevant work and was not disabled, ending his analysis at step four. Although not required to proceed to step five, the ALJ further found that, even assuming Plaintiff could not perform his past relevant work, there were a significant number of jobs that he could perform, again basing his determination on the vocational expert's testimony. (Tr. 14-22.) Plaintiff pursued administrative review with no success, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-8.)

III.

Plaintiff argues that the Commissioner's finding that he has the RFC to perform a full range of medium work is not supported by substantial evidence in the record as a whole. RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), (b) & (c), 416.945(a)(1), (b) & (c). The ALJ bears the final responsibility for assessing a claimant's RFC at step four of the sequential evaluation, based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 416.927(e)(2), 416.945(a)(3).

Here, the ALJ found that Plaintiff retained the RFC to perform a full range of medium level of work, i.e., lifting up to fifty pounds at a time, with frequent lifting or carrying of objects weighing up to twenty-five pounds, and no further restrictions. (Tr. 18.) *See* 20 C.F.R. §§ 404.1567(c), 416.967(c).

Plaintiff asserts that the RFC assessment was largely based on the ALJ's determination that he was not telling the truth about his impairments and resulting limitations. In his application papers, Plaintiff asserted that he has constant sharp, stabbing pain in his right shoulder, which becomes worse when he uses his right arm. (Tr. 117.) He testified at the hearing that his shoulder is "unstable" and "hurts most of the time," due to surgery he underwent after a car accident to remove a bone sliver that was buried in his cartilage. He said he has difficulty sleeping. (Tr. 526, 529.) He said he can sit for at least twenty minutes, stand for about ten minutes, and walk a maximum of forty-five minutes. He said he can bend, but might not be able to stand back up. (Tr. 526.) He said he cannot lift over five pounds due to the problems with his right shoulder, and can only push a grocery cart with his left arm. (Tr. 527.) He said that, on a normal day, he wakes up, watches TV or lies in bed, sometimes gets on the computer, usually does not eat breakfast, fixes packaged noodles for lunch and a sandwich for supper, then goes to bed whenever he gets sleepy. (Tr. 525; *see* Tr. 118.) In his application papers, he reported that he is able to take care of his personal grooming, do laundry, wash dishes, vacuum/sweep, take out the trash, shop, pay bills and use a checkbook, drive, and walk for exercise or errands. He said he has no hobbies and does not do further chores because using his right arm causes too much pain. (Tr. 115-16.)

The ALJ must evaluate a claimant's credibility before determining his RFC. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). The ALJ is in the best position to gauge credibility and is granted deference in that regard as long as he explicitly discredits a claimant's subjective testimony and gives good reasons for doing so. *Id.* at 695-96. The Social Security regulations and rulings identify a number of factors for the ALJ to consider in assessing credibility, most of which were set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). *See* 20 C.F.R. §§ 404.1529(c), 416.929(c)[2]; Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3, *5 (S.S.A. 1996).

The ALJ stated that he had evaluated Plaintiff's subjective allegations and complaints utilizing the criteria of *Polaski*, the applicable regulations, and SSR 96-7p (Tr. 18), but did not list the applicable factors. He found that Plaintiff's testimony and written allegations were "not wholly credible nor supported by the evidence as a whole insofar as the claimant alleges an inability to perform all work activities." (Tr. 20.) In reaching this conclusion, the ALJ stated that Plaintiff's credibility was "compromised by a number of inconsistencies," including: (1) the lack of supporting medical evidence; (2) the ALJ's observations of Plaintiff during the administrative hearing; (3) the absence of any opinion

---

[2] As stated in this regulation, the ALJ is required to consider, in addition to the objective medical evidence and the claimant's prior work record, statements and observations made by the claimant, his or her medical providers and any others regarding (1) the claimant's daily activities, (2) the location, duration, frequency and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) type, dosage, effectiveness and side effects of medications, (5) non-medication treatments or other measures taken to alleviate pain and symptoms, and (6) functional limitations.

from a treating or examining physician that he is disabled; (4) his "poor compliance with medication therapy"; and (5) his ability to perform work activity after his alleged onset date. (Tr. 19-20.)  Plaintiff argues that these reasons are not supported by the law or the facts. The Court agrees that the ALJ's assessment of Plaintiff's credibility is inadequate in several respects, as explained below.

The Commissioner is correct that there are minimal clinical findings to substantiate the degree of Plaintiff's alleged pain and limitations.  An October 2001 MRI scan was unremarkable (Tr. 412); a December 2002 CT scan showed a "slight abnormal curvature of the scapula" (Tr. 318, 323-24); a March 2003 right shoulder x-ray showed that the shoulder joint was intact, with no area of bony destruction or soft tissue calcification (Tr. 284); May 2003 x-rays showed no abnormalities in the right shoulder, right scapula and thoracic spine (Tr. 275-77); and a July 2003 cervical spine x-ray indicated "mild" degenerative disc disease at C5-6 (Tr. 218).  A July 2003 consultative exam showed full range of motion in the right shoulder and unreduced motor strength in the right arm.  (Tr. 219).  An August 2004 exam by a consultative orthopedist again showed full range of motion in the spine and all joints.  (Tr. 450-51.)  Nerve conduction studies in July 2005 revealed "mild" carpal tunnel syndrome in both arms, but no cause for the reported right shoulder pain.  (Tr. 470-74.)

However, an ALJ may not disregard a claimant's subjective allegations of pain solely because they are not fully supported by objective medical evidence.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008).  Additionally, results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision.  *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003).  Here, the only specific medical evidence

referenced by the ALJ in his credibility discussion are the results of a one-time physical examination in July 2003 by Robert K. Heck, M.D., the results of a one-time physical examination by an orthopedist at the request of the SSA in August 2004, and Plaintiff's alleged report that "Ultram helps control" his right shoulder pain. (Tr. 19.)[3]

The record contains ample medical evidence to support Plaintiff's allegations of significant, ongoing shoulder pain. Apparently, his shoulder problems began in April 2001, when he strained his right shoulder while emptying garbage cans at work. (Tr. 429-36.) His problems were exacerbated by motor vehicle accidents in July 2001, March 2002, and May 2004.[4] (Tr. 396, 423, 463.) Between April 2001 and November 2006, he was: treated for right shoulder pain at the hospital ER on twenty occasions (Tr. 236-446); received treatment for his right shoulder pain from an orthopedist (Brian G. Dickson, M.D.) on twenty-four occasions (Tr. 220-25); underwent arthroscopic shoulder surgery by Dr. Dickson in May 2002 (Tr. 222, 368-74), with another surgery recommended (Tr. 220); underwent at least three rounds of physical therapy (three times a week, for four weeks) (Tr. 224, 145-73, 174-93, 194-217); and sought treatment from James M. Robinette, M.D.,

---

[3]The ALJ also discussed the medical evidence regarding carpal tunnel syndrome. (Tr. 19.) Plaintiff's arguments here focus on the ALJ's decision to discount his allegations of right shoulder pain, and he does not appear to challenge the ALJ's determination that he suffered no disabling limitations due to carpal tunnel syndrome.

[4]The ALJ began his discussion of the medical evidence with Plaintiff's March 2002 motor vehicle-related injury. (Tr. 16.) However, the medical records document right shoulder pain back to April 2001, including a referral to an orthopedist for the shoulder problems in August 2001. (Tr. 418.)

a family practitioner, or his staff, on forty-one occasions for treatment of pain, primarily in his right shoulder (Tr. 454-67, 502-16).[5]

During arthroscopic surgery in May 2002, Dr. Dickson "pulled the [middle glenohumeral] ligament well inside the joint," then "tightened this down" and removed a subacromial spur. (Tr. 222.) Although Plaintiff had some improvement after one round of post-operative physical therapy, he continued to experience pain to the extent that Dr. Dickson and other physicians felt it necessitated narcotic pain medication (*e.g.*, Darvocet, Vicodin, Ultram), anti-inflammatory medications, injections, more physical therapy, and exercises with a Thera-Band. (*E.g.*, Tr. 220-22, 244, 248, 254, 256, 262, 287, 305, 314, 320, 348.) A CT scan in December 2002 showed an "abnormal superomedial scapular edge with abnormal convex curvature of the medial edge [3 to 4 cm in length] towards the thoracic wall and ribs ... [which] may be catching upon the upper second and third ribs posteromedially as the scapula moves across the posterior thoracic wall," as well as "granulomatous disease of the mediastinum with multiple heavily calcified lymph nodes." (Tr. 323-24.) Dr. Dickson referred to this as a "spur on his scapula" and recommended another surgery, advising Plaintiff of the associated risks (Tr. 220). At the next visit on January 29, 2003, Dr. Dickson said he did not want Plaintiff to get addicted to his pain medication and again recommended surgery, and Plaintiff said he was trying to work out the insurance details. (Tr. 220.)

---

[5]It appears that he saw Dr. Robinette 23 times and received therapeutic treatments from other staff on the remaining dates, i.e. "Phoresor" (iontophoresis) and "therm" (presumably thermal treatments).

Plaintiff did not return to Dr. Dickson but instead continued to seek relief for ongoing shoulder pain from the hospital ER through August 2003, then from Dr. Robinette from April 2004 to November 2006. Dr. Robinette also prescribed a variety of pain management treatments, including narcotic and anti-inflammatory medications, injections, traction, iontophoresis, thermal and moist heat treatments, a cervical collar, a rib belt, and referral to rehabilitation. (*E.g.*, Tr. 454, 456, 458, 463, 465, 467, 503, 506, 510, 513, 516.) He ordered a cervical spine CT, which showed osteophytosis at the C5-C6 level, posterior disc bulging, and a focal disc protrusion that indents the thecal sac and abuts the spinal cord." (Tr. 230-31.) He also ordered the nerve conduction studies due to Plaintiff's complaints of constant pain in his right shoulder and neck, numbness in his right hand and arm, and loss of strength in the right arm. (Tr. 471.)

The ALJ relied primarily upon the report of Dr. Heck, who examined Plaintiff once in July 2003, diagnosing him with "snapping scapula right shoulder."[6] In examining the right shoulder, Dr. Heck noted tenderness to palpation; "a little bit of decrease[d] sensation" over the right deltoid muscle, axillary nerve region and right medial border of the scapula; and a bony prominence at the medial edge of the scapula. (Tr. 218-19.) Although observing that Plaintiff had full range of motion in the shoulder, Dr. Heck noted that he was "only limited by pain." (Tr. 219.) A hospital record from the same month (July 2003) states that Plaintiff was observed to have "limited range of motion sec[ondary] to pain." (Tr. 254.) This is consistent with Plaintiff's statements that he is *able* to engage in some daily

---

[6] Snapping scapula, also sometimes called scapulothoracic crepitus or scapular crepitus, is characterized by a painful cracking or snapping in the shoulder blade, believed to result from improper motion of the shoulder blade against the rib cage and thoracic (upper) vertebrae. *See* http://www.shoulder1.com/edu-ctr/clinicaloverview.cfm/3 (last visited Mar. 18, 2009).

activities but that using his right arm makes the pain worse and prevents him from doing more. Furthermore, the physical therapy records from 2002 show that he presented with decreased range of motion and decreased muscle strength (Tr. 156-57, 189-91, 213-15), and his range of motion did not improve to normal limits until October 2002, only after several months of physical therapy (Tr. 145-73). Even then, he was still experiencing below-normal muscle strength in the right shoulder and impaired functioning in extended reaching, overhead reaching and repetitive gripping. (Tr. 146-47.) The final physical therapy report in October 2002 noted that Plaintiff "continue[d] to complain of increased pain with work activities requiring continuous shoulder activity" (Tr. 149), again consistent with his statements in his disability application. It is noteworthy that Plaintiff reported in June 2004 that, while he had worked as a pizza delivery person for a number of years, he was then working "inside and helping answer phones because [he] cannot cook or lift anything ... and do not have a car to deliver anymore." (Tr. 94.) In making his RFC findings, the ALJ assessed no limitations due to extended, overhead or repetitive reaching, nor did he adequately explain why he chose not to do so.

The ALJ also stated twice that Plaintiff reported on August 30, 2003, that "Ultram helps control his right shoulder pain." (Tr. 17, 19.) A condition that can be controlled by treatment or medication cannot be considered disabling. *Schultz v. Barnhart*, 479 F.3d 979, 983 (8th Cir. 2007). The treatment notes for the date in question, however, show Plaintiff told the ER nurse that he was experiencing "throbbing" right shoulder pain on level 8 out of 10, that his shoulder felt like it was "freezing up," that he had full range of motion but felt a "grinding," and that "Ultram helps." (Tr. 239.) He had earlier told Dr. Heck that Ultram gave him "minimal relief." (Tr. 219.) No medical records state that he was ever

able to *control* the shoulder pain; rather, the records show that he stated several times that his pain was not controlled by his pain medication or that he still experienced pain while on prescribed medications (Tr. 219, 221, 454), and he pursued a number of alternative, non-medication treatment options in seeking to alleviate his pain, as noted above.

The ALJ repeatedly emphasized references in the record to times that Plaintiff reported being out of pain medication and needing more. (Tr. 16, 17.) Although a claimant's misuse or overuse of medication is a valid factor in the ALJ's credibility determination, *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003), the record here also shows that Plaintiff attempted to decrease his dependency on pain medication, seeking detoxification at one point and pursuing alternative pain management techniques, as set out above. (Tr. 327-41.) Further, Plaintiff asserts that the reason he frequently ran out of medications was because the doctors who treated him only prescribed a short supply of pain medications to lessen the possibility of addiction or dependency. (*See* Tr. 508 [telling him to return when his medications ran out].)

The ALJ also discounted Plaintiff's credibility due to his "poor compliance with medication therapy," which he said suggested "a lack of motivation to be well in order to work." (Tr. 20.) He cited generally to the hospital ER records (over 200 pages) and Dr. Robinette's records for seven months in 2004 (Tr. 454-67). While there are some instances of missed appointments and occasional noncompliance, the overall record shows that Plaintiff has consistently sought treatment for his chronic shoulder pain over a period of five years, trying a number of different treatments, with little relief. He did fail to follow through with the second surgery recommended by Dr. Dickson in January 2003. (Tr. 220.) At that time, he told Dr. Dickson he was trying to work out the insurance details. He

later reported to the ER that Dr. Dickson would not perform the surgery "because of his financial situation." (Tr. 260.) On other occasions, he told the ER staff that "no one will work on [his shoulder] due to money" that he was unable to afford a doctor or surgery but was waiting on an insurance settlement from a motor vehicle accident, that another doctor said the surgery was "too dangerous" for him to do, and that another wanted "up front money." (Tr. 237, 239, 251, 254.) Dr. Heck also recommended that Plaintiff have an MRI in July 2003 to further evaluate his shoulder problem, and Plaintiff told him he did not have insurance and could not afford an MRI. (Tr. 218.)

The regulations provide that failure to follow a prescribed course of treatment without good reason precludes a finding of disability. 20 C.F.R. §§ 404.1530(a-b), 416.930(a-b). An ALJ must inquire into the circumstances surrounding a failure to follow a prescribed course of treatment, and must determine whether compliance would restore the claimant's ability to work or sufficiently improve his condition. *Burnside v. Apfel*, 223 F.3d 840, 844 (8th Cir. 2000). Lack of financial resources may in some cases justify the failure to seek medical attention or follow prescribed treatment. *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989). It is for the ALJ to determine a claimant's motivation for failing to comply with a doctor's recommendation. *Id.* at 275.

Here, the ALJ failed to mention the fact that Dr. Dickson had recommended a second surgery, address Plaintiff's need for the surgery and whether it would alleviate his ongoing problems, or adequately discuss whether Plaintiff's claim of financial hardship precluded him from obtaining needed treatment or complying with medical recommendations. *See Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) ("lack of insurance" did not excuse claimant's failure to pursue mental health treatment where no

evidence that claimant was ever denied such treatment because of insufficient funds or insurance); *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir.1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of poverty); *Kirby v. Sullivan*, 923 F.2d 1323, 1328 (8th Cir. 1991) (ALJ should examine claimant's subjective ability to comply with prescribed treatment before assuming noncompliance was willful or indicative of symptom exaggeration).

The ALJ also relied on the fact that none of Plaintiff's treating or examining physicians had opined that he was disabled by any of his impairments. (Tr. 19.) A doctor's silence on the claimant's work capacity does not constitute substantial evidence to support an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment and did not state that he could engage in full-time employment. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001); *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001).  In any event, a medical source opinion that a claimant is "disabled" or "unable to work" would receive no deference because a finding of disability is one reserved for the discretion of the Commissioner.  *Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008).  None of Plaintiff's doctors discharged him from treatment and, in fact, continued treating him for shoulder pain through at least November 2006.  Therefore, the fact that no doctor stated that Plaintiff was unable to work is not necessarily dispositive.

Another factor the ALJ considered in assessing credibility was his observation of Plaintiff during the hearing, noting that he was appropriately dressed, his gait and speed were normal, he was able to ambulate, sit and rise without signs of distress, and he did not

require any assistive devices. (Tr. 19.) An ALJ's personal observations of a claimant are a relevant factor in a credibility determination. *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). Although the ALJ was entitled to rely on his observations to some degree, those stated are of little relevance to Plaintiff's principal allegation of disability – his ability to use his arms and shoulders.

The ALJ further discounted Plaintiff's credibility because he had performed some work activity after his alleged onset date. (Tr. 20.) While working part-time during a period of alleged disability may demonstrate that a claimant is able to do more work than he actually did, *see* 20 C.F.R. §§ 404.1571, 416.971, a consistent work record can also support a claimant's subjective complaints of pain, demonstrating efforts to remain employed. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007); *Burnside*, 223 F.3d at 845. Therefore, this factor does not necessarily weigh against Plaintiff's credibility.

When, on judicial review, a claimant contends that the ALJ failed to properly consider his subjective complaints of pain, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738.

As explained above, the ALJ failed to mention or discuss material evidence in the record that supports Plaintiff's subjective allegations of shoulder pain and undermines the ALJ's stated reasons for discounting his credibility. It also appears that the ALJ drew

14

erroneous inferences from some evidence and gave undue emphasis to other evidence. Under these circumstances, the Court finds that this case should be remanded for the ALJ to fully consider the evidence under the *Polaski* standards, to explicitly state all of his reasons for discounting Plaintiff's allegations as not credible, and to point to specific evidence in the record supporting his reasons.  While the ultimate outcome may be the same, the better course is to allow the ALJ to reconsider Plaintiff's application based on full and proper consideration of the evidence.  *See Ford*, 518 F.3d at 983.

Additionally, because the record contains a significant amount of evidence documenting limitations due to his right shoulder pain, the ALJ should explain why he included no limitations on reaching in the RFC and discuss whether such limitations would preclude the performance of Plaintiff's past work or other work.

IV.

ACCORDINGLY, the Commissioner's decision is **reversed** and this matter is **remanded** to the Commissioner for further proceedings consistent with this opinion.  This is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

IT IS SO ORDERED this 23rd day of March, 2009.

_____
UNITED STATES MAGISTRATE JUDGE